UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                                                                          CASE NO: 2:16-cr-101-FtM-UAMRM

RICARDO GARCIA

## OPINION AND ORDER[1]

This matter comes before the Court on review of Defendant Ricardo Garcia's Motion to Suppress (Doc. 20) filed on November 29, 2016. The Government filed its Response in Opposition on December 22, 2016. (Doc. 27). The Court held a hearing on February 8, 2017. Garcia was present and represented by counsel, Albert Z. Levin. The Government was represented by Assistant United States Attorney Jeffrey F. Michelland. For the reasons stated below and on the record at the conclusion of the hearing, the Court Denies the Motion to Suppress.

## BACKGROUND

On March 1, 2016 at around 2:00 a.m., Captain Pete Hedrick of the Lee County Sheriff's Office ("LCSO") was on patrol, driving southbound on Interstate 75 in Fort Myers, Florida, when he observed a silver Chevrolet that bore a Texas license plate. From his vantage point driving in the same direction, he recognized that the Chevrolet was operating in excess of the speed limit at approximately 80 miles per hour, and that the

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

vehicle drifted out of its lane before suddenly jerking back on course.  Captain Hedrick switched on his lights and conducted a traffic stop.

As the Chevrolet pulled over to the right shoulder of the road, Captain Hedrick parked behind it, exited his vehicle, and approached from the passenger side.  Reaching the Chevrolet, he observed Garcia in the driver's seat.  Beside him in the front passenger seat was a female who appeared to be asleep.  He found this to be odd because, in his over 20 years of law enforcement experience, he had never observed an individual sleep through a traffic stop once he approached a vehicle.  Finally, looking to the rear of the vehicle, a male passenger was seated directly behind Garcia.  Captain Hedrick noticed that the rear passenger stared straight ahead, sat rigidly with wide eyes and did not acknowledge the officer's presence.

As Captain Hedrick explained the reason for the stop, he inquired about the vehicle's destination.  Garcia indicated that he had been driving for 17 hours to reach Naples, Florida from Fort Worth, Texas.  Observing the other occupants of the vehicle while the conversation took place, Captain Hedrick noticed that the female passenger's eyes peeked open periodically, and reached the conclusion she was merely feigning sleep.  He further noticed that the Chevrolet's occupants were dressed differently, as the both Garcia and the female passenger were wearing loose, comfortable, athletic clothing and the male passenger was wearing new boots and jeans.  He also observed the male passenger fumbling with his boots.  From his experience with the LCSO, he noted that the male passenger's clothing stood out because when passengers engage in long-distance vehicular travel, it is common to wear comfortable clothing. Captain Hedrick also

knew that it is a common tactic for undocumented immigrants to hide documentation in their shoes and wear newly store-bought clothing.

After assessing the scene, Captain Hedrick requested Garcia exit the Chevrolet and proceed to Captain Hedrick's vehicle to discern if he was under the influence of alcohol or merely inattentive and sleepy. Both individuals then walked back to the vehicle, making conversation about road-related matters such as the price of gas. Captain Hedrick then requested Garcia's driver's license and inquired as to the reason for his visit, to which Garcia responded that it was for the benefit of the male passenger. Captain Hedrick then rhetorically clarified his understanding of Garcia's intent, finding that the purpose of the trip was not to visit Southwest Florida, but to drop off the male passenger. Garcia did not dispute this assertion.

Evaluating the circumstances of the stop, Captain Hedrick then indicated that he was no longer concerned that Garcia was under the influence, but that he was still going to run Garcia's driver's license and check for warrants. Then, another officer, Sergeant Quaintance arrived at the scene. Captain Hedrick requested that Sergeant Quaintance issue Garcia a warning and continue to run his identity through a database for warrants.

Captain Hedrick then proceeded back to the Chevrolet. This time, he apologized for disturbing the female passenger, and requested that she provide the registration and insurance information for the vehicle. He further inquired as to her relation to the other vehicle occupants. As she searched for the documentation, she indicated that she was Garcia's wife, and indicated that the male passenger was a family member. Captain Hedrick then inquired further about the male passenger and her destination, causing her

to become flustered. She stated that her husband, Garcia, could better answer his questions.

Captain Hedrick then spoke to the rear passenger in Spanish, requesting his name. He responded that his name was Oscar Sanchez. Captain Hedrick then returned to Garcia, who upon being asked, indicated that he thought the male passenger's name was Jose. Captain Hedrick, then summed up his understanding of the events that had previously transpired, asking Garcia "you drove halfway across the United States with this man, [and] you said you don't even know his name?" Garcia responded that he was simply giving the male passenger a ride. Captain Hedrick advised Garcia that transporting undocumented immigrants across state lines was illegal. He then proceeded back to the Chevrolet and asked Garcia's wife how many people they had dropped off. She responded that they had transported two other individuals. With that, Captain Hedrick asked the occupants to exit the Chevrolet.

Although the male passenger presented no evidence of his identity, Sergeant Quaintance attempted to identify him. In the process, the male passenger turned over his wallet, and Sergeant Quaintance observed that it contained Mexican pesos. Sergeant Quaintance then utilized a fingerprint scan, which revealed the passenger's name to be Juan Casimiro-De Paz, that he was an undocumented immigrant who had previously been removed, and that he had an active warrant for his arrest.

While this was ongoing, Garcia indicated that he was in possession of $2,500.00 which was provided in exchange for transporting Casimiro-De Paz. Garcia's information was then provided to U.S. Customs and Border Protection, Casimiro-De Paz was

transported to the Lee County Jail, and Garcia was permitted to leave with the female passenger.

## DISCUSSION

Garcia argues that the statements elicited during his traffic stop should be suppressed because the stop and the subsequent investigation violated the Fourth Amendment. Upon review, this argument is incorrect.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth Amendment." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* Probable cause exists when the facts and circumstances would lead a reasonably prudent person to believe a violation of the law has occurred. *See United States v. Campbell*, 920 F.2d 793, 796 (11th Cir. 1991) (internal punctuation omitted).

Consistent with the Supreme Court's holding in *Terry v. Ohio*, 392 U.S. 1 (1968), the Government may also justify the stop where an officer possesses reasonable articulable suspicion based on objective facts that an individual is engaged in criminal activity. *United States v. Chanthasouxat,* 342 F.3d 1271, 1275 (11th Cir. 2003)*; see also United States v. Lopez-Soto,* 205 F.3d 1101, 1104 (9th Cir. 2000). In either case, whether

a traffic stop is the result of probable cause or reasonable suspicion, evidence gained as a result of a Fourth Amendment violation must be excluded as a "fruit of the poisonous tree." *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002).

In *Whren*, the Supreme Court found that pretextual "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Instead, the Court found that where an officer has probable cause at the time of the stop to believe the individual has "violated the traffic code[, then that] render[s] the stop reasonable under the Fourth Amendment." *Id.* at 819.

Turning to the statutes governing vehicle operation, Florida Statute 316.817(2)(a) states that "[t]he maximum allowable speed limit on limited access highways is 70 miles per hour." Section three of the same statute provides that violations of the speed limit "must be cited as a moving violation." *Id.* at 316.187(3). Separately, Florida Statute 316.089(1) states that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved until the driver has first ascertained that such movement can be made with safety."

Against this backdrop, Captain Hedrick's decision to conduct a traffic stop was plainly reasonable and based on probable cause that a traffic violation had occurred. His testimony established that he was able to pace the Chevrolet's rate of speed with his vehicle. From there, he ascertained that the Chevrolet was exceeding the speed limit by traveling 80 miles per hour in a 70 mile per hour zone. Additionally, Captain Hedrick testified that he observed the Chevrolet drifting out of its lane. Both observations supplied probable cause that Garcia was operating the Chevrolet in violation of the Florida state traffic laws.

Garcia attempts to rebut the legality of the stop by arguing that because Captain Hedrick noticed that his license plate was from Texas, the stop was pretextual. As is clearly laid out in *Whren*, that argument cannot carry the day because pretext is irrelevant if probable cause exists.

Garcia next argues that even if the traffic stop was proper, the duration of the stop exceeded the limits of the constitution and rendered the fruits of Captain Hedrick's investigation excludable as fruits of the poisonous tree. "Because a routine traffic stop is only a limited form of seizure, however, it is more analogous to an investigative detention than a custodial arrest." *United States v. Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007) (citations omitted). From this standpoint, the stop's duration is analyzed under the *Terry* standard, which requires that the investigation be "reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir.2003) (citing *Terry*, 392 U.S. at 20).

"An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999). However, "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." *Ramirez*, 476 F.3d at 1236. The corollary to this principle is that when an officer has conducted a traffic stop, "the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Pruitt*, 174 F.3d at 1219. This can occur where the officer "has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *Id.* at 1220.

Garcia incorrectly argues this case compares favorably with *Pruitt*. In *Pruitt*, a vehicle carrying marijuana was stopped for speeding. *Id*. at 1217. The police officer then asked the driver to step out of the vehicle, and the driver complied. *Id*. The officer then took Pruitt back to the police cruiser where he checked his driver's license and asked him a variety of questions, including his occupation and the identity of three other passengers in the vehicle. *Id.* at 1218. During the course of the questioning, the officer then asked if he could search the vehicle, which the driver refused. *Id*. As a result of the refusal, the officer then called for a drug dog, and the driver was forced to wait over fifteen minutes before a drug dog could appear, at which point the dog alerted to the presence of drugs. *Id*. Weighing the facts, the court found that the officer's line of questioning, and the duration of the stop were both unlawful because the officer had no reasonable suspicion that a crime other than speeding had occurred. *Id.* at 1221. The court additionally found that the stop was unreasonably delayed when the police officer asked if he could search the vehicle, the driver refused, and a drug dog was called. *Id*.

This case is distinguishable from *Pruitt*. Unlike *Pruitt* there is no indication here that Captain Hedrick intentionally prolonged the traffic stop for investigative purposes. *See id*. at 1218. To the contrary, he called for backup and once Sergeant Quaintance arrived, he was directed to speed the process along by issuing Garcia a warning while Captain Hedrick went back to the Chevrolet to verify documentation.

Whereas the officer in *Pruitt* had no reasonable suspicion of criminal activity on which to verify his investigation, that is not the case here. *See id*. at 1221. At the stop's inception, the Chevrolet's Texas license plate alerted Captain Hedrick that the vehicle came from an area from which undocumented immigrants are routinely transported. But

this alone did not form the basis for the circumstances that led to the discovery of Garcia's criminal activity. Rather, as the traffic stop unfolded, Captain Hedrick was alerted to the possibility of illegal activity in several ways.

Between the female passenger's attempt to act as if she was asleep during the stop, the male passenger's state of petrification, the clothing worn by the Chevrolet's occupants, and Garcia's manifestation that the purpose of the trip was to drop the male passenger off in Naples, Captain Hedrick was alerted almost immediately to the possibility of criminal activity. His suspicions were further heightened when the male passenger provided him with a different name than that which Garcia provided.

The Court must examine the totality of the circumstances to determine whether the officer had a sufficient basis to suspect legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). From this standpoint, the facts plainly indicate that from the initial point of contact during the traffic stop, Captain Hedrick was provided with a specifically articulable and continuing stream of indicators that criminal activity was afoot. While each occurrence may not have been an obvious indicator of criminal activity on its own, Captain Hedrick's suspicions were reasonably triggered when viewing them as a whole and his line of questioning was proper. The Court finds that the stop was not unduly delayed by such questioning. There was no constitutional violation in the execution or duration of the stop.[2]

---

[2] To the extent Garcia argues that the traffic stop involved some violation of his Miranda rights, he is incorrect. Though the right to Miranda warnings attaches when custodial interrogation begins, *see Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court has held that a traffic stop is not a *per se* instance of custodial interrogation that would invoke that right. *See Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). The unplanned nature of the traffic stop here, its public location, and its brevity indicate that Garcia was not subjected to restraints comparable to those associated with a formal arrest and thus that his Miranda rights were not infringed upon. *Id*. at 441.

Accordingly, it is **ORDERED:**

For the reasons expressed herein, and those enumerated on the record, Defendant's Motion to Suppress (Doc. 20) is **DENIED**.

**DONE AND ORDERED** in Fort Myers, Florida, this 14th day of February, 2017.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  Counsel of Record

10